I'm going to ask you to make some comments about the rules, but maybe some of the later ones are not familiar, that we have the traffic light system, we have a yellow light that comes on at 18 minutes, and when you have two minutes left, we appreciate your winding up when the red light comes on. Please, you can conclude unless the court is asking you a question. We also very much appreciate hearing record citations when those are applicable. That said, the first case of the morning, number 18, 31269, United States v. Huntsberry, and we'll hear from Mr. Abelley. Yes. Good morning. Chris Abelley, court-appointed counsel for Jabori Huntsberry, who raises two challenges to his jury conviction in this case. The first challenge is to the sufficiency of the evidence of his felon in possession of a firearm, and the other is his challenge to the jointer and thereafter failure to sever that firearm charge from the marijuana trafficking activities. Today I want to focus on the latter charge because it is the most consequential for Mr. In addition, the discussion of the jointer severance issue will necessarily touch upon the sufficiency question that we raised. Notice the court knows jointer and severance are controlled by Rule 8, Rule 14 of the Federal Rules of Criminal Procedure. When jointer is, Rule 8 governs jointer when it's proper. Failure, if it's improper, the reversal is required if there's actual prejudice. Under Rule 14, if even a properly joined cases can be, charges can be severed if there's prejudice. In either case, the defendant has to show prejudice. So our focus today will be on the prejudice arising in this case from Mr. Huntsberry being in constructive possession of a firearm owned by another person in a trailer in which he lived with his girlfriend and which was owned by his mother who lived next door. That offense tried with the marijuana offense which involved packages, suspected packages of marijuana being mailed from California to various points related to the defendants in this case. And then they were picked up and brought immediately to the home of Nicandra Moore and Ivan Ardoin. You're relying, of course, on the recent decision of the Supreme Court, rehalf. I wonder, the reality of criminal defense, whether rehalf really works to the advantage of a defendant and on the question if you have no chance of severance, you can't stipulate out the felony provision because now you've got to go to the jury and ask the jury about it. So, you know, rehalf, you know, by requiring this finding of awareness of status, so that creates a bit of a dilemma in terms of severance and tactics and strategy. And it also affects error, too. I'm not quite sure I understand what that probably means. So, in other words, now the defendant must not only show that he was fired, but . . . Well, the law has been clarified in rejecting several circuits, including ours, that insist that the government burden now is to demonstrate that the jury to find that he's an awareness of status. In other words, not just possessing the weapon if you didn't realize it's not worth it. We've seen that in some cases with the hunting, some guys are hunting and they get a parole. In particular, in Louisiana, they get a parole. Awareness of status is a very important issue. Right. And I think awareness of status in this case might actually be real, given the nature of his particular offense, which occurred when he was 18 years old, it was for having sex with a 15-year-old. A 12-year-old. Was it 12? Yeah, according to the PSR. So, on that issue, on the rehafe issue, to the extent you're pressing that, I assume you are. I'm sorry? I assume you're pressing the rehafe issue since . . . Actually, he was pressing prejudice from severance to begin with. Well, I thought we had bounced over to rehafe. We did bounce over to it, yes. Okay. Well, I'll tell you what, to the extent that you want to press the rehafe issue because it is a new Supreme Court decision, we're still on direct appeal, we can talk about that, but you please go back to your severance. And I believe that the rehafe came out, it's hard to ignore it, but I think that we have a problem with the sufficiency of the evidence irrespective of rehafe in this case for the policy case where the government has presented no evidence, that extra evidence that they need to show constructive possession. Well, could the jury have inferred that the AK-47 was in a closet for up to four years? Could a reasonable jury have inferred that? Well, I don't know that they could infer that. All we know is that the gun was left by Mr. Ardoin, his gun, in the constructive possession of Nanette Hunsberry, who lives next door. It ends up, four years later, someone sees it in the closet. Right. Was it there for four years? Is that a reasonable inference? We don't know, but that's not our role, right? We're supposed to say whether a reasonable jury could have inferred that from the evidence. I don't know. A reasonable jury could infer that it was there for some time. Okay. And we have a picture of the gun? No. Of the gun? The gun. Of the gun, yes. The gun, since it's an AK-47. Right. In the closet. We don't have a picture of the gun in the closet, which is important in this case. We don't know anything about the gun. The only reason why we know the gun was found was through the presentation of hearsay by the government, permissible hearsay, that a gun was found, I believe the witness said, I believe the gun was found in the closet, and nothing else. We don't know. A closet off the bedroom. A closet off the bedroom that, again, the witness says, I believe belonged to Mr. Hunsberry, but I'm not really sure. Was it a single trailer or a double-wide trailer? Good question. The government doesn't say. The government doesn't provide a layout of the trailer or anything like that. The government doesn't say that, you know, there's belongings of Mr. Hunsberry next to the gun. Well, there was no question it was a trailer and he lived in it. There is no question of that. And his girlfriend had a child, evidently, so. It wasn't the child's gun. It wasn't the child's gun. There was also a 9mm pistol. Right. Right. Somewhere in the closet. And of course, you know, not only, but not only does he live with his girlfriend, we do know that his mother owns the trailer and lives next door and seems to exercise dominion over this trailer. She intercepts packages that are delivered there. The gun was left with her and did end up in the closet. So, you know, the jury could, there's enough there that should require the government to show that that gun was either in plain view or was next to belongings that belonged to Hunsberry. But. But. Well, I understand that we have cases in which that scenario is presented where a gun's in plain view and so the jury can make the inference or the gun is found among the belongings so the jury can make that inference. My question is, is that in your, is that the outer bounds of, I mean, is that an absolute necessity for there to be a plain view in order for the inference to be drawn by the jury? Or here we have a different fact scenario. You don't, if, if plain view would certainly be enough for the government. If you don't have plain view and you've got, you know, the, I forget the case name or the one where they found the gun inside of a drawer, but it has next to the man's clothing, his socks, et cetera. So there's that option as well, but there has to be something. I believe that, you know, the language in the case, Mergerson is that there has to be something. Well, sure. In that case, you rely on that case heavily and I understand why. We say in, we say, for example, this may come from Mesa, but I think it's also quoted in Mergerson, that what we're looking for is, quote, evidence supporting at least a plausible inference that the defendant had knowledge of and access to the illegal item. That seems to be the target we're pointing at. I'm trying to figure out if there's a plausible. Yes. And, and given that language, you have a court, a court that says that a handgun under the mattress isn't, doesn't satisfy that. Right. But in that case, there was also evidence that the girlfriend had bought it, the gun, I thought. Correct.  Here, we, I don't have any evidence. Well, here, here we know the gun, we, we know that the gun doesn't belong to Mr. Hunsberg. We know it belongs to the government's key witness. Ivan Ardiman. So there's that parallel. All right. But, you know, we, we hope to get a new trial on all the offenses in this case. And coming back to the severance, when you have a prior, a felon in possession case, in McCarter and Holloway, we had felon in possession. This court reversed on, on finding that it was an improper failure to sever because the jury got to hear that there was a prior conviction in a case where the firearm wasn't related to the underlying charges and where that information would not have come to the jury on a trial just on the non-weapons offenses. And we think that that's a parallel we have here. Now, the evidence of, one of the key things this court looks to is the strength of the evidence. The evidence of the drug charges, it certainly is not, it's not insignificant. But what this court has said is it must be, to quote the court, is whether this court can say that the evidence was so overwhelming that the jury was not in fairly influenced by the fact that they were judging a felon. And we look to the jury's acquittal of Nanette Hunsberry as illustrating that that factor should weigh in Mr. Hunsberry's favor. How old was Nanette? I don't know. Old enough to be my client's mother. So he, he was in his 30s. 30s. Yeah. She could have been 50 or something. Right. And, you know, she. But she wasn't a senile little old lady in other words. No. She, she, you know, she had the post, she was the postal worker. She had the post office box. She had all those packages came in her name except the ones that went to Nakendra Moore, her cousin. She picked them up all the time. She was known to routinely intercept packages that came addressed to her at the, at the trial. She didn't know anything about anything. Yeah. Well, and, and, and then of course all of these packages, only four of them were ever known, actually known to contain drugs. So the only four that were actually opened by the, by the government. But the last one of those was delivered to her at her instruction, even though it had Jabari Hunsberry's trailer address on it. She brings it home. They execute a search warrant. Oh yeah. And it's in the bathroom. Right. And they, they, the jury acquits her. They, they find my client guilty on all charges and... You offered to the, to the government to stipulate that, that he was, he was a felon and in support of your motion for severance? Did, did, yes, that was stipulated, that he was a felon. I understand. But, but the normal move would be to try to persuade the, the court with a push of a judge that to agree that, that if, if, take away the, the, take the gun issue off the table so that they don't, they don't really get, the jury doesn't realize this person's a felon. Once you tell a jury the person's a felon, I'm sorry, but I've lived in trial court for a long time and the, and the curtain comes down and the government wants to get that information before the jury. So we have this concept of legal concept that, well, they're going to go and consider it for this reason and that instruction is sufficient. Just forget that he's a felon. I mean, I, my point being that, that the new decision of Rafe where you want to litigate the question of, of status and so forth, but you, back to, back up to the question, you give up your severance. Now that's my, I, I, I've been a little obscure, but I just, in terms of the practice and, and that is important because it, it, it has a lot to do with the fairness of these trials. Oh, well, I'm just wondering why you wouldn't, why, why you wouldn't want to sever the case and then, or, and then be able to argue Rafe. Well it's obvious why they don't want to sever the case. They want to tell the jury that he's got a felony. Right. And that's correct. And by the way. I mean, this is no secret. Well, and that's an element of the possession crime. I think what you're saying is that strengthens the argument for severance. Right. Oh, I see. Yes. And, and I wanted to point out that I think it was 12 times in this case from voir dire closing arguments, the jury was told that Mr. Jabari, Hunsberry was a convicted felon. So that you have no, apparently you have no copy of the judgment that was entered in that, in that case, in his sex offense case. Correct. And not only that, it was left off the PSR that originally went into this record. But that was just a clerical error. Well, is it a practice when someone receives a conviction like that, which is allegedly a felony status, because I'm taking your word for it, I mean, it looked like statutory rape to me, but anyway, if that's a felony, is it a practice for the judgment to say you may not possess a firearm? I do not know the answer to that, particularly given, given that I tend to do only the appeals part of these cases. Yeah. And, and, and then of course, that's going to vary from state to state. I mean, the rehafe issue is whether he knew his sufficient evidence that he knew his status as a, somebody who had been convicted of a crime punishable by more than a year, I think is what the statute says. Right. He has to know it was a felony. And so, this was carnal knowledge of a juvenile, I mean, I, I, I looked in the record and found the supplemental PSR that said he pled no contest and received a suspended two years incarceration. I mean, do you have any reason to doubt that? I have no reason to doubt that. Okay. My time is up. That's, that's a stipulation made by the, what everybody knows at that point in time. Yes, at that point in time for sure. You're taking it off, yeah. It doesn't mean that, it doesn't foreclose the question of the awareness of the defendant at the time. Correct. And the lawyer tells him that was a felony and we, and we agree to it and try to get it off the books. All right. You have time for rebuttal. Ms. Domaine. Good morning and may it please the court, I'm Camille Domaine, I represent the United States, the appellee in this case. Since counsel began and, and I think tried to focus mostly on the severance question, sort of weaving in some of the sufficiency of the evidence arguments, I'll try to do the same. I'll also try to hit on some of the rehaif concerns and that may make the presentation a little jumbled, but I'll try to hit on some of the concerns that the members of the court expressed during counsel's argument. So beginning with the issue of severance, as counsel noted, there are two different issues here. The Rule 8 Joinder issue and then the Rule 14, sort of, where the district court has a, what I call a discretionary severance to avoid prejudice. The defendant did not argue below Ms. Joinder and I understand under Holloway that the Rule 14 argument preserves it, but I think this, but the fact that it wasn't urged below, I think explains why the district court didn't engage in an extensive discussion of why Rule 8 Joinder was appropriate. But I would suggest that it certainly was in this case. And the case law from this court says that when we look at the transactional requirement under Rule 8, it's sort of a logical relationship test. It's not merely the immediacy of the act, so it's not only a temporal inquiry, but it's sort of what's the logical relationship. Now the district court relied on three different cases principally, Bullock, Fortenberry, and all of those involved situations where there was an investigation and where guns were found in the course of the investigation. In at least a couple of them, there was a search warrant that was executed and so the question became, well, do we satisfy that transactional aspect of the Rule 8 Joinder requirement if we find the gun in, sort of, in the course of conducting our investigation on the other charges? And in all three of those cases, this court said yes. I've additionally cited Mays, which I think is very close to this particular case because it was also a drug and gun sort of case. Counsel tries to distinguish particularly Bullock and Fortenberry on the grounds that those cases were not drug and gun cases and that particularly in Bullock and Fortenberry, it involved offenses that would have already gotten the fact of the gun before the jury. But the alleged prejudice in this case is not the fact that the jury heard about the gun. The alleged prejudice in the case is, as Judge Higginbotham points out, the fact that the jury hears about the prior felony conviction. But this court noted, I think the case I cite in my brief unpublished case, Marshall, is that if that was the rule, that, you know, there's some sort of per se prejudice, we would have to sever every felony possession case every time we tried a felony possession with any other offense. And that's just not been the practice of this court in all of the cases that I just cited. Instead, and Bullock is the case we cite for this, I think it's our best case on this, because the limiting instruction is exactly the language that was approved in Bullock. The district court did two things. The first thing it did was it said, we're going to give a sanitized stipulation that he has a prior felony conviction. And that was done without objection from the defendant. As I point out in my brief, counsel, or the defendant argues in his brief, that it's possible that maybe the jury inferred, because the nature of the prior offense was not specified, that maybe the jury inferred that the prior was for drugs. Well, if the defendant was concerned about that, the sanitized stipulation, an old chief type stipulation as I call it, was for the defendant's benefit. If he was concerned that that stipulation, sort of an unspecified felony, was too prejudicial, he didn't have to accept that stipulation, and we could have done something else. Well, let me ask you a question. In the course of reaching this stipulation, was there evidence? Where does the evidence or information about the prior conviction come from? Only in the pre-sentence investigation. Well, which you obviously didn't have at the pretrial stage. So somebody, how did they find out that he was a felon? How did the grand jury find out that he was a felon? We knew that he was a felon. Well, I don't want to know how you, I know you knew, but how did you, in other words, somebody must have had a copy of a judgment from somewhere. Well, that would have been . . . Or did the jury indict the proverbial ham sandwich? I mean . . . Well, to answer one of the questions you asked, counsel, it's not in the record. So as we stand here today, because this was never contested, the fact of that conviction was never contested in the district court. He stipulated to it. He didn't object to it. Well, I guess that's because of the impact of Raheif, maybe, but . . . I think that could have been, although, kind of going ahead to the Raheif issue, you know, this is one of these cases where I think a defendant would have to think long and hard about whether he didn't want to stipulate and whether he wanted to put that fact issue before the jury because . . . Did the jury know that he was a felon? Were they told that? Yes. There was a stipulation. And why did the jury need to know he was a felon? The gun's highly relevant to coming to evidence on the question of dealing drugs and so forth that characterizes the crime, but that's not the point. The point is the characterization that he's a felon comes from . . . it's another element. You've got your drug conviction or not, and you've got part of that evidence, but the separate offense is that he's a prior felon. They stipulate to that that he's not . . . there's nothing for the jury to decide. Now, my point earlier was that now there is something for the jury to decide given these other . . . that's another whole set of issues, and that complicates this whole issue. But why does the jury get . . . why is the jury told that? I'm well aware of what the cases say, and there's a lot of discretion by the trial court in this thing, but . . . and apparently the lawyer . . . your answer is that the defendants didn't request that. No. The . . . it's . . . if you look at the motion to sever, which is RLA 259 through 61, the motion to sever does not address at all whether there's going to be a stipulation or whether we want to prove up the nature of the felony. Well, you're saying that they didn't raise it and they didn't make this effort. What I'm saying is if you look at the motion to sever, there's no discussion about a stipulation. If you go ahead to the pretrial conference when the judge makes a ruling on the motion to sever, that's the first time you see . . . and it could . . . as I stand here, I can't remember, unfortunately, whether the government raised the issue of stipulation. I think the government did in its response to the motion to sever. But in any event, the district court says what we're going to do is we're going . . . the jury will never hear the nature of the prior offense. The district court thought the nature of the prior offense would be very prejudicial in this case because it was carnal knowledge of a juvenile. And as Judge Jones points out, it was an 18-year-old defendant and a 12-year-old girl and an actual sex act, more than one actual sex act. So that's what the district court was concerned. That was the prejudice the district court was concerned about guarding against. And the defendant never objected to that. The defendant never said, no, I don't want a stipulation or I want it clear that my prior is not for a drug offense. So while I'm on the rai if issue, I'll mention a couple things. It's our position that a Rule 28J letter isn't the proper vehicle for preserving that. But what you're saying is that the focus was trying to sanitize as best as you could what the felony conviction was. What's the relevance of the felony conviction if you stipulate there is one? As long as there's no severance, then the relevance is it's an element the government has to prove under 922G. And of course, the district court denies the severance, so it becomes an element of 922G that the government has to prove. In this case, there was a stipulation. The court gave this court standard instruction that says the parties have stipulated. This is an element that's already proven. Well, then you have to prove possession. That's correct. Now look, was there the implication that he was dealing the drugs out of the trailer? No. There was no evidence that he was dealing drugs out of the trailer. When the search warrant was executed, the officers found a scale, a digital scale, which is consistent with trafficking. They found this composition book that an officer testified included code consistent with being a drug ledger. And all of those pages of the composition book are in the record. There was testimony, and I do want, Judge, I'm glad you brought this up at this point because I do want to correct one inadvertent error in my brief. In footnote 18, I talk about the officers finding two bags of marijuana in Jabor's residence. That is not correct, and I'll explain how the confusion with that comes up. I think what is correct is that the officers found one opened bag of marijuana that was the sealed bags they had found in other seizures. There is a confusing picture in the record. This is at ROA 1887. It shows the AK-47, the pistol, and two sort of large-ish bags of marijuana, and it looks like that all came out of the same place. But there's later explanation that I found last night as I was reviewing Sergeant Broussard's testimony that really explains how those two bags were found in the mother's house, and what was found in Jabor's house was one opened bag of marijuana that was consistent with those. So you do have that, Judge, you do have that there was some sort of indication that at least at some time he had had a significant distribution type quantity of marijuana in the residence. I mean, you also have an inference, I think the jury could glean, that drug proceeds were there. Well, how big were these packages that were being transported? You can see in that picture, that's at 1887. Yeah, that's what I thought. Right. That would hold a fair quantity. Right. They do. They would hold it. And I think one of the things that made all these shipments so suspicious was they were all approximately the same weight. So most of these shipments contained about two or three pounds of marijuana. I'm not sure if they were in compressed bundles, but you can see in the picture that it's about that big. So, moving ahead a little bit to the Rye Eve issue, to the extent the court wants to address it, I think this is the kind of case where a defendant would have a hard time establishing that he didn't know his status as a prohibited person. Judge Junkin, as you pointed out, the PSR reflects that he was sentenced to two years of incarceration. It was suspended. Under Louisiana law, they handle probation differently than we do in the federal system. So probation under Louisiana Code of Criminal Procedure, Article 893, there's a sentence of imprisonment that's suspended and a term of probation is imposed up to three years unless it's another certain kind of offense. So the probation was really sort of part and parcel of a suspended sentence of incarceration of two years. The defendant served the entire three years. He had to register as a sex offender. He went through a revocation proceeding because he wanted to cohabitate with a woman who had a minor child. So there was an actual revocation proceeding. He was not revoked because they came to some arrangement where the child was not actually going to live with them. And most significantly, at the time the defendant committed and was convicted of this offense, as it is today, the offense of conviction was called felony carnal knowledge of a juvenile. Louisiana has two statutes. Felony carnal knowledge of a juvenile is Louisiana revised statute 14 colon 80. Misdemeanor is 80.1. So for him to have been sentenced to a felony term, which he was, he was convicted of the felony gravity. So how do you know that there was a 1480? Somebody knew that. Well, Judge, I would, if you're asking me, is there a document in the record? Have I seen a document now? But that's the kind of thing when we investigate these cases, and this is just outside the pen pack that has this kind of information in it. We would have scrutinized that. Some agent would have testified to the grand jury that the defendant had a conviction. And again, as we stand here, he's never denied that he had a conviction. He never denied that it was a felony. He never denied that he was a prohibited person. A possible Rahaib argument would be that because the conviction had some age on it, that maybe he would have forgotten. But, you know, we would have a jury argument that it would be kind of hard to forget a serious conviction of that nature for which you had to register as a sex offender and for which you received. Well, as far as that goes, even before Rahaib, if if the person's prior was was not a felony, then he wouldn't be liable for the gun possession. So that's correct. He'd have every incentive to have challenged that, I guess. That's correct. I'll touch I'll touch briefly on the sufficiency of the evidence argument. Judge Duncan, as you pointed out, what the case law requires is only a plausible inference. And the district court addressed the Murgison issue expressly distinguishing Murgison. This discussion begins around 467, ROA 467, where the district court says this case is not Murgison. First, this, you know, the Murgison case involved a pistol that had been in a residence, as as you pointed out, had been bought by someone else by the girlfriend. It was underneath a mattress. So it was not not only was it not in plain view, but I would call it hidden, which is which is different from a gun being in a closet, a gun in a closet to interrupt, but remind me in Murgison, correct me if I'm wrong, the defendant in that case, how long had he been living in the place? One month. One month. Approximately one month. And in this case, and the district court expressly used this as a point of comparison, the jury could have inferred, and again, they could have inferred something else, but on sufficiency review, we of course view the evidence in the light most favorable to the verdict, but the jury could have inferred that that gun was picked up by Jabouri the night of New Year's Eve, 2010, brought into his residence, put in the closet, and it remained there for four years. Even if he did not pick it up, as the district court pointed out, the jury could have inferred that in four years' time, he would have seen a gun of that size, shape, and dimension. The jury, the actual gun was introduced in evidence. The jury saw the actual firearm. There are pictures of it that were substituted in the record. The picture of the AK, I believe, is 1721. There's also the evidence receipt from the AK that says found in Mr. Hansberry's bedroom, so it shows that it was actually found in his bedroom. Just so I understand, counsel, sorry to interrupt, what we're looking for here is some indicia of constructive possession or dominion over. We're not interested in ownership. It doesn't matter that somebody else owned it. We're looking for a reasonable, evidence from which a jury could reasonably infer that he was exercising some kind of dominion over the firearm, right? And so this thing was found in a closet. Jury could have thought, could have reasonably said it's been here for years. It's an AK-47, right? It's not a Derringer. It's not something hidden in a shoebox. That's correct. Okay. That's correct. And, you know, as counsel points out, the testimony on this, you know, could be a little bit clearer. When the witness was asked where was it found, he said, you know, it's my understanding or I believe or I think he said it's my understanding that it was found in the closet. But then on cross-examination, defense counsel says, isn't it true it was actually found under a mattress? He says, no, it's my understanding it was found in a closet. So, you know, that's certainly evidence from which the jury could have inferred. And again, if you look at 1887, ROA 1887, that's the picture that shows the evidence receipt says it was not only the AK, but a loaded magazine. And 1887 shows the magazine in the gun. Now, the record doesn't reflect whether the magazine was actually in the gun, but even if it wasn't, the magazine alone is a substantial contraption. This is one of these sort of curved magazines that fits in an AK-47. Again. Or they use that in deer hunting, yeah. Probably not, Your Honor. But again, I think it's the district court's point is this is a sizable weapon. It's not the sort of thing that you could put in a little shoebox, stuff in the back, and no one would ever see it. If you're talking about the photograph that shows two packages that are sort of displayed along the upper part of the gun, and then there's a pistol underneath. That's right. And if you look at ROA 868, the Sergeant Broussard concedes, and if you see on the top right hand corner, there's some handwriting that says press photo. Sergeant Broussard, that's Sergeant Broussard's handwriting. And counsel says, you know, now that picture doesn't reflect how the things were actually found. And he says, no. That's my handwriting. That was a press photo. The two bags came out of Nanette's house in the control delivery package, but those are the guns. And so you can see the pistol. You can see the AK-47. Both had loaded magazines, and you can see all of that depicted in that particular picture. Thank you. Okay. Thank you. Mr. Aberle. I think it's important to note one thing, and I take responsibility for this not being clear, but the record is the record. A deputy sergeant with the sheriff's office said he found marijuana, suspected marijuana and a scale in Jabari Hunsberry's trailer. I don't think that you can rely on that as being true for several reasons. One is the postal inspector said no marijuana was found. Two, the government has presented no evidence to the jury of this supposed marijuana or the scale. The only scale found in this case was, as you'll see in the picture in Exhibit 12, it's a bathroom scale, and it was found in Nanette Hunsberry's house. Furthermore, there's a return on the search warrant. It is at 1584, ROA 1584. It says what was found during that search. There's no mention of drugs or a scale, and this is important because, back to the severance question, is there a connection between the gun and the drugs? There was no drug activity occurring at Mr. Hunsberry's house, and that is what distinguished — that's what makes this case, like McCarter, we believe, that's what makes it — unlike Bullock. Bullock, there was a gun found in the trunk. I appreciate your argument, but what about the character of the gun itself? Doesn't that speak — that's one of my comments earlier, which was on the facetious comment, the AK-47 with those large 160-cartridge clips is not a — a juror can reasonably infer that that's the kind of weapon that's highly relevant to drug trafficking. The character of the gun itself is relevant. Yeah, but I think that that's just a general notion about weapons. That's not a bird-hunting gun. It's not, but then again, it's not even his — you know, we still have to deal with the — you know, if it's not even his gun, and we can't know anything about it other than it's been sitting in a closet — Well, I understand that, whether it's his or not, but — But if the gun — You're talking about the relevance of it. But if all we know is that it's in a closet, and that there's no drugs going through this man's trailer, then we shouldn't be able to just say that it's part of the same transaction. That's our point, and that's what distinguishes Bullock, because in Bullock they found a gun in the trunk, and this court found that that gun was present when he was making his getaway from a robbery, and he could have used that gun. He may not have used it during the — Did anybody look at the weapon to see when it was manufactured? I'm sorry, say that again? Did anyone look at the weapon to see when it was manufactured? When it was manufactured? Yeah. Not that I — I don't know about the firearms examiner, but I have no idea. Well, we're talking about four years. That's a question you might ask. I see. I see. And my only final point is, you know, to the extent it matters whether Mr. Huntsbury raised the Rule 8 issue in his initial motion, the hearing on that Rule 8 was done outside of the presence of a court reporter. The court came back, put it on the record, and talked about Rule 8. So I think that to the extent you could argue there's any kind of waiver there, we don't have that word here, and that's all I have. Okay. Thank you very much. You're court-appointed here, I see, so thank you very much. It's always a pleasure to see you.